| | |
|---|---|
| **CIM, LLC,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No.: _____ |
| | ) |
| **SERIES PROTECTED CELL 1, A SERIES OF** | ) |
| **OXFORD INSURANCE COMPANY TN, LLC,** | ) |
| | ) |
| Defendant. | ) |

# COMPLAINT

Comes now Plaintiff CIM, LLC, by and through counsel, pursuant to Rule 57 of the Federal Rules of Civil Procedure, and 28 U.S.C. § 2201, *et. seq.*, and for its complaint, states as follows:

## PARTIES

1. Plaintiff CIM, LLC is a single member limited liability company organized and existing under the laws of the State of New York with its principal place of business in the State of New York.

2. Plaintiff's single and Managing Member, Thomas J. Curran, is a resident of the State of New York.

3. Plaintiff is in the business of providing personalized wealth management services and wealth investment services to personal and institutional investors or consultants doing business as Curran Wealth Management and Curran Investment Management.

4. Upon information and belief, Defendant Series Protected Cell 1, A Series of Oxford Insurance Company TN, LLC ("Oxford" or "Defendant") is an entity organized and existing under the laws of the State of Tennessee with its principal place of business in Nashville, Tennessee. Upon information and belief, Oxford is the sole member of Series Protected Cell 1.

5. Upon information and belief, Oxford's sole member is Oxford Acquisition Company which is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Boston, Massachusetts.

6. Oxford markets itself as a leading provider of captive insurance services, and claims to lead the nation in delivering comprehensive enterprise risk solutions to businesses, financial institutions, and professionals.

## JURSIDICTION AND VENUE

7. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 and 2201.

8. Complete diversity of citizenship exists between Plaintiff and Defendant and the amount in controversy exceeds $75,000.

9. In addition, in its First Cause of Action, Plaintiff seeks a declaratory judgment, pursuant to 28 U.S.C. § 2201, arising out of a case of actual controversy concerning the parties' rights and obligations under a certain Actual Net Loss Insurance policy issued by Oxford to Plaintiff and pertaining to certain claims submitted by Plaintiff to Oxford which Oxford has denied as further alleged herein.

10. Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b) because Defendant's principal place of business is in Nashville, Tennessee and the policy of insurance at issue provides that any action brought in federal court to enforce the policy may be brought only in the United States District Court for the Middle District of Tennessee.

## FACTS

I. **Actual Net Loss Insurance Policy Issued by Oxford to Plaintiff**

11. Oxford issued an Actual Net Loss Insurance Policy to Plaintiff, Policy Number 2-

B/56-E-20, for policy period December 15, 2020 to December 14, 2021 ("the Policy"). A true and correct copy of the Policy is attached hereto as <u>Exhibit 1,</u> Bates stamped Policy00001 to Policy00040.

12. The Policy lists Plaintiff as the Named Insured.

13. The Declarations page of the Policy includes "Crime" as an event included in the "Schedule of Events" covered under the Policy with a "Limit of Liability Per Incident" under the "Crime" coverage in the amount of $750,000. Ex. 1, Policy0002.

14. The Policy provides in pertinent part:

    **I.**     <u>**INSURING AGREEMENT**</u>

        A. Subject to the limits, conditions, and exclusions contained in this **Policy**, and to any applicable **Deductible**, **Company** will pay to **Insured** reporting the **Scheduled Event** the amount of **Actual Net Loss** arising from any **Scheduled Event** that first occurs during the **Policy Period** and is reported during the **Policy Period** or the **Grace Period**; provided, however, that in no event shall **Company** pay any **Actual Net Loss** incurred by any **Insured** in connection with a **Scheduled Event** more than thirty-six months after the date that the **Scheduled Event** first occurred. **Company's** liability to pay such sums will attach as of the receipt of notification of the **Scheduled Event** in accordance with Section VI of this **Policy**. If such notification is made during the **Grace Period**, such notification will be deemed to have been made on the last day of the **Policy Period**.

Ex. 1, Policy0005 (bold in original).

15. The Policy further provides in pertinent part:

    **IV.**     <u>**DEFINITIONS**</u>

        A. <u>Actual Net Loss</u>: Casualty incurred by **Insured** as a result of a **Scheduled Event**. Actual Net Loss for which **Company** provides coverage in connection with each **Scheduled Event** is identified in the definition for such **Scheduled Event** and may include **Claims Expenses**, **Covered Expenses**, **Claims Losses**, **Extra Expenses**, and/or **Income Loss**, or such other measure of loss as is specified in the definition for such **Scheduled Event**.

        . . .

H. <u>Company</u>: Series Protected Cell 1, a Series of Oxford Insurance Company TN LLC, a protected cell captive insurance company licensed by the State of Tennessee.

I. <u>Covered Expenses</u>: Costs, fees, and expenses, other than **Claims Losses**, incurred by **Insured** as a result of a **Scheduled Event** during the twelve-month period starting with the date that the **Scheduled Event** first occurred and actually paid by such **Insured**

Ex. 1, Policy0009-0010 (bold in original).

16. Under that same Section IV. Definitions, the Policy further continues in pertinent part with the following definition:

KK. <u>Scheduled Event</u>: An incident specified in the Declarations of this **Policy** which causes a loss to an **Insured**. The Scheduled Events are defined as follows:

. . .

17. **"Crime"** event, which means the unlawful taking of property to the deprivation of Insured or a third party, whether by an **Employee** or a third party, and whether such property is at **Insured's** premises or in transit, including takings accomplished by means forgery, embezzlement, burglary, robbery, fraud (including credit card fraud, computer fraud, and electronic funds transfer fraud) and extortion. A Crime event shall be deemed to first occur at the time when **Insured** first becomes aware of facts which would cause a reasonable person to assume that a loss of a type covered by this **Scheduled Event** has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount or details of the loss may not then be known, or when an **Insured** first receives notice of an actual or potential **Lawsuit** in which it is alleged that such **Insured** is liable to a third party under circumstances which, if true, would constitute a loss under this **Scheduled Event**.

**Actual Net Loss** under a Crime event shall consist of losses incurred by **Insured** arising out of such event, including loss or damage to money, securities, and tangible property of **Insured**, reimbursement to Insured of sums paid to third parties arising out of such event, and **Claims Expenses** and **Claims Losses** resulting directly from such event. **Actual Net Loss** also consists of loss resulting directly from forgery or from alteration of checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in money that are made or drawn by or drawn on an **Insured**, or made or drawn by one acting as an agent of an **Insured**. **Actual Net Loss** does not include losses indirectly caused by such event including an

4

**Insured's** inability to realize income that such **Insured** would have realized had there been no event, or payment of costs, fees, or other expenses incurred by **Insured** in establishing either the existence or the amount of a loss under this **Policy**.

Ex. 1, Policy00013-0014 (bold in original).

18. In the event of a dispute arising under the Policy, Section IX. of the Policy titled Dispute Resolution provides in pertinent part:

> B. <u>Governing Law</u>. This **Policy** and all questions with respect to the rights and obligations of the **Company** or any **Insured**, the construction, enforcement, and interpretation hereof, shall be governed by the laws of the State of Tennessee, without regard to conflict of laws provisions.
>
> C. <u>Venue and Jurisdiction</u>. Any suit or action brought to enforce this **Policy** or any rights granted pursuant to this **Policy** may be brought only in the United States District Court for the Middle District of Tennessee or a state court of competent jurisdiction within Davidson County, Tennessee. **Company** and **Insured** hereby agree that such courts will have venue and exclusive subject matter and personal jurisdiction, and consent to service of process by registered mail, return receipt requested, or by any other manner provided by law.

Ex. 1, Policy00035 (bold in original).

19. Concerning notice to be provided by Plaintiff to Oxford, the Policy provides:

> X. **NOTICE**
>
> Any notice or other communication to **Company** under this **Policy** shall be in writing and shall be deemed given upon receipt by **Company** at the mailing address set forth below or at such other address or email address as **Company** shall hereafter furnish in writing to **Insured**.
>
> Series Protected Cell 1, a Series of Oxford Insurance Company TN LLC
> do Oxford Management Company LLC
> 954 Ridgebrook Road, Suite 100
> Sparks, Maryland 21152

*Id.* (bold in original).

## II. Covered Claims - Five Fraudulent Wire Transfers

20. On February 23, 2021, the work email account of an executive of Plaintiff was hacked by an unknown, third party bad actor who used the unauthorized access to the email

account to impersonate Plaintiff's executive for the purpose of perpetrating a fraudulent scheme to provide electronic funds transfer instructions to a subordinate of Plaintiff's executive, directing the employee to wire $170,000 out of the executive's personal investment account with Plaintiff into the bank account of a third party based on a fraudulently created request.

21. As a result of that fraudulent email, on February 25, 2021, Plaintiff's employee unwittingly followed the fraudulent email instructions of the impersonator and wired $170,000 out of the executive's personal customer account he held with Plaintiff into the account of Vmax Holdings, LLC at JP Morgan Chase Bank.

22. Thereafter, on March 1, 2021, Plaintiff's employee received additional emails from the unknown bad actor fraudulently impersonating Plaintiff's executive and this time instructing Plaintiff's employee to arrange a transfer of $423,000 "that day" to the same account as before.

23. That same day, Plaintiff's employee unwittingly complied with the fraudulent email instructions of the impersonator and wired $423,000 out of the executive's personal customer account with Plaintiff into the account of Vmax Holdings, LLC at JP Morgan Chase Bank.

24. Then, on March 10, 2021, Plaintiff's employee again received emails from the unknown bad actor continuing to impersonate Plaintiff's executive and this time fraudulently instructing her to arrange a transfer of $400,000 out of the executive's account with Plaintiff into the account of Vmax Holdings, LLC at JP Morgan Chase Bank and also to arrange a transfer of $200,000 out of the personal investment account that the executive's spouse held with Plaintiff and into the account of Janet Khuu, Co. at US. Bank.

25. That same day, Plaintiff's employee unwittingly followed the fraudulent email instructions of the impersonator and wired $400,000 out of the executive's personal account with

Plaintiff into the bank account of Vmax Holdings, LLC at JP Morgan Chase Bank and successfully wired $200,000 out of the personal investment account that the executive's spouse held with Plaintiff into the account of Janet Khuu, Co. at US. Bank.

26. Once again, on March 18, 2021, Plaintiff's employee received more emails from the unknown bad actor continuing to impersonate Plaintiff's executive with more fraudulent instructions this time directing the employee to arrange a transfer of $350,000 out of the personal investment account that the executive's spouse held with Plaintiff into the account of Vmax Holdings, LLC at JP Morgan Chase Bank.

27. And once again following the fraudulent instructions of the impersonator, that same day, Plaintiff's employee unwittingly wired $350,000 out of the personal investment account that the executive's spouse had with Plaintiff into the bank account of Vmax Holdings, LLC at JP Morgan Chase Bank.

28. On March 24, 2021, the unknown bad actor tried once again to impersonate Plaintiff's executive, emailing Plaintiff's employee again directing the employee to arrange another fraudulent wire transfer.

29. This time, however, the funds were not transferred because the course of communications lead to the discovery of the hacking of the email account and the fraudulent conduct of the unidentified bad actor.

30. On March 25, 2021, Plaintiff filed Internet Crime Complaints with the Federal Bureau of Investigation reporting the above five incidents of fraudulent wire transfer crimes perpetrated on Plaintiff.

31. The electronic funds transfer fraud perpetrated on Plaintiff resulted in the unlawful taking of $1,543,000.00 to the deprivation of Plaintiff from its clients' investment accounts with

Plaintiff.

32. The ensuing investigation determined that the electronically transferred funds were no longer in the accounts to which they had been transferred, the funds could not be located, and the identity of the impersonator who perpetrated the electronic funds transfer fraud was unknown.

33. On April 7, 2021, Plaintiff submitted five separate Claim Forms to Defendant, one for each of the fraudulent electronic funds transfer incidents detailed above, seeking coverage under the Crime event provisions of the Policy for the unlawful taking of property to the deprivation of the Plaintiff and its third party clients from whose investment accounts the funds were fraudulently taken by means of electronic funds transfer fraud ("the Claims").

### III. Oxford's Wrongful Denial of Plaintiff's Claims

34. Following Plaintiff's submission of the Claim Forms to Defendant, on November 14, 2022, Defendant delivered a letter to Plaintiff notifying Plaintiff that it was denying Plaintiff's Claims for coverage under the Policy on the grounds the Claims triggered Exclusion R of the Policy which Oxford contended excludes claims for losses caused directly or indirectly by the "voluntary parting with property by Insured . . . if induced to do so by fraudulent scheme, trick, device or false pretense." Ex. 1, Policy00030.

35. On December 16, 2022, on behalf of Plaintiff, Plaintiff legal counsel delivered correspondence to Defendant appealing Defendant's denial of coverage of the Claims under the Policy.

36. In its appeal letter, Plaintiff requested Defendant reconsider its denial and accept coverage of the Claims because, under Tennessee law, Exclusion R does not bar Plaintiffs' electronic funds transfer fraud because the application of Exclusion R to bar coverage for electronic funds transfer fraud "totally nullifies the Crime Scheduled Event coverage" that is

specifically provided in the Policy, not merely limiting the 'Crime' Scheduled Event coverage, but eviscerating it, rendering Exclusion R and the Crime provisions ambiguous at best in which event the language must be construed in favor of Plaintiff and coverage for the Claims.

37. On March 15, 2023, Defendant sent correspondence to Plaintiff denying Plaintiff's appeal of Defendant's denial of the Claims, primarily relying on legal opinions from courts in other jurisdictions construing insurance policies with coverage language different from the Policy at issue here.

## FIRST CAUSE OF ACTION - DECLARATORY RELIEF

38. Plaintiff adopts and incorporates by reference the allegations set forth in the preceding paragraphs above as though completely and fully set forth herein.

39. A dispute has arisen between Plaintiff and Defendant regarding whether Defendant is obligated to provide coverage to Plaintiff for the Claims.

40. An actual controversy presently exists between Plaintiff and Defendant regarding the parties' rights and obligations under the Policy for the Claims Plaintiff submitted to Defendant seeking coverage under the Policy.

41. Plaintiff seeks a judicial determination of the parties' rights and obligations under the Policy pursuant to 28 U.S.C. § 2201, and a declaratory judgment is needed and appropriate to determine the rights and obligations of the parties under the Policy to confer certainty on the parties and serve the interests of justice.

42. Specifically, Plaintiff seeks a judicial declaration that the Claims it submitted under the Policy for the actual net losses it incurred as a result of the five incidents of electronic funds transfer fraud perpetrated upon it are covered Crime events under the Policy, and that Defendant is obligated to pay Plaintiff the amount of its actual net loss arising from the Crime event.

9

2347701.1

Case 3:23-cv-00479   Document 1   Filed 05/11/23   Page 9 of 12 PageID #: 9

## SECOND CAUSE OF ACTION – BREACH OF CONTRACT

43. Plaintiff adopts and incorporates by reference the allegations set forth in the preceding paragraphs above as though completely and fully set forth herein.

44. In consideration for premiums paid by Plaintiff to Defendant, Defendant issued the Policy to Plaintiff as the Named Insured on the Policy, creating a contractual relationship between Plaintiff and Defendant.

45. Plaintiff's Claims are covered under the Policy for five separate "Crime" events as that is defined under the Scheduled Event definition of the Policy for the actual net loss incurred by Plaintiff as a result of an unlawful taking of property to the deprivation of Plaintiff or a third party, whether by an employee or a third party, by means of electronic funds transfer fraud.

46. Plaintiff gave timely notice of the Claims in accordance with the provisions of the Policy.

47. Plaintiff is, and at all material times was, in compliance with all conditions precedent for coverage under the Policy.

48. Pursuant to the terms of the Policy, Defendant is obligated to pay the actual net loss incurred by Plaintiff as a result of the five Crime events, including the total of the funds unlawfully taken to the deprivation of Plaintiff from its clients' investment accounts as a result of the fraud alleged herein totaling $1,543,000.00, plus all sums paid by Plaintiff to third parties for investigation and other attempts to locate and recover the funds arising out of the unlawful taking, and such other expenses arising from the unlawful taking in amounts to be shown at trial.

49. Despite proper notice and Plaintiff providing all requested documentation concerning the Claims, Defendant has refused to provide any coverage for the Claims.

50. Oxford's denial and refusal to pay Plaintiff's Claims constitutes a breach of

Oxford's contractual obligations to Plaintiff.

51. As a direct and proximate result of the Defendant's contractual breach, Plaintiff has been damaged in an amount of not less than $1,543,000.00 for the loss of funds unlawfully taken by means of electronic funds transfer fraud, plus all sums paid by Plaintiff to third parties for investigation and other attempts to locate and recover the funds arising out of the unlawful taking, and for such other expenses incurred by Plaintiff arising from and related to the unlawful taking perpetrated upon it.

## PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff prays for judgment against Defendant as follows:

1. That proper process issue and Defendant be served with a copy of the Summons and Complaint and be required to appear and timely answer this Complaint;

2. For a declaration of the rights and obligations of the parties, specifically including a declaration that the Claims submitted by Plaintiff to Defendant under the Policy for the actual net losses it incurred as a result of the electronic funds transfer fraud perpetrated upon it are covered Crime events under the Policy and not barred by any exclusion and that Defendant is obligated to pay Plaintiff the amount of its actual net losses arising from the Crime events as defined in the Policy;

3. That judgment be entered by this Honorable Court finding that Defendant breached its contractual obligations under the Policy and that Plaintiff has been damaged in an amount of not less than $1,543,000.00 for the loss of funds unlawfully taken by means of electronic funds transfer fraud, plus all sums paid by Plaintiff to third parties for investigation and other attempts to locate and recover the funds arising out of the unlawful taking, and for such other expenses

incurred by Plaintiff arising from and related to the unlawful taking perpetrated upon it, and awarding a judgment in favor of Plaintiff in an amount of not less than $1,543,000.00, with the total amount of damages to be shown at trial; and

4. For pre-judgment and post-judgement interest, attorney fees, and costs to the extent allowable by law; and for such other and further relief as this Honorable Court deems just and proper.

**RESPECTFULLY SUBMITTED** this 11th day of May, 2023.

**CIM, LLC**

By: /s/ Reuben N. Pelot, IV
**REUBEN N. PELOT, IV, ESQ., BPR#014986**
EGERTON, McAFEE, ARMISTEAD & DAVIS, P.C.
900 S. Gay Street, Suite 1400
Knoxville, TN 37902
(865) 546-0500
rpelot@emlaw.com
*Attorney for Plaintiff*